UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**H.W, by and through her next
friend, JENNIE W.,**

     *Plaintiff-Appellant,*

**v.**                                **Case No. SA-21-CV-0344-JKP**

**COMAL INDEPENDENT SCHOOL
DISTRICT,**

     *Defendant-Appellee.*

## <u>MEMORANDUM OPINION AND ORDER</u>

This is an appeal from an administrative due process hearing under the Individuals with Disabilities Education Act ("IDEA"). Before the Court is "an electronic copy of the certified administrative record in Texas Education Agency special education due process hearing docket number 336-SE-0820." *See Notice of Filing* (ECF No. 12).[1] And in accordance with its *Briefing Schedule* (ECF No. 11), the Court has under consideration *Appellant's Brief* (ECF No. 14) and *Appellant's Reply Brief* (ECF No. 18). Similarly, it has under consideration *Defendant's Motion for Summary Judgment* (ECF No. 16), which the Court construed as an appellate brief when it denied the motion as unnecessary. *See ECF No. 17*. The parties have informed the Court that they "do not

---

[1] The Administrative Record consists of five volumes plus miscellaneous documents. The appealed decision, administrative pleadings, and correspondence comprise Volume I. Volume II contains Joint Exhibits (J-1 to J-16) submitted by the parties at the administrative hearing. Volumes III and IV contain the exhibits proffered respectively by the Appellant (Exhibits P-1 to P-21) and Appellee (Exhibits R-1 to R-35) at the hearing. Volume V contains transcripts of all transcribed proceedings.

In general, the Court will cite to the administrative record generically as "R." with a page reference to the sequential page-numbering at the lower right-hand corner. Appellant provides similar cites but Appellee cites to the Volume # with undefined specific page references. While Appellee fails to explain how it determines its cited page numbers, the Court has deduced that it uses the page numbers provided by Adobe for each Volume. Such page-number usage certainly has some appeal for those reviewing the documents through Adobe. The better practice, however, is to use a page-numbering system that enables all reviewers to find the cited page, whether or not the reviewer conducts the review through Adobe. Appellee's cited pages create some confusion.

anticipate the necessity of a hearing for receiving additional evidence." *See ECF No. 13*. Nevertheless, both sides have attached documents to their respect briefs. *See ECF Nos. 14-1; 16-1, 16-2, and 16-3*. The appellate record is now complete, and the Court is prepared to rule. After considering the full appellate record, all additional evidence presented, the arguments of the parties, and the applicable law, the Court affirms the Decision of the Hearing Officer and finds that the preponderance of the evidence supports finding that the challenged individualized education program ("IEP") appropriately addresses H.W.'s educational needs and that the District has complied with the procedural aspects of the IDEA, except for a procedural error recognized and addressed by the Hearing Officer.

## I. BACKGROUND

Plaintiff-Appellant H.W., an elementary student in the Comal Independent School District ("Comal ISD," "the District," "Defendant," or "Appellee"), is eligible for special education and related services as a student with various medical issues, including Down Syndrome (also referred to as Trisomy 21), attention deficit hyperactivity disorder ("ADHD"), and a speech impairment. R. 516, 2074. She appeals from a partially adverse due process hearing decision issued with respect to her IEP for the 2020-21 school year.

### A. Pre-Kindergarten and Kindergarten

In April 2017, H.W.'s mother[2] requested a Full and Individual Evaluation ("FIE") due to concerns that H.W. "may require specially designed instruction." R. 158. The mother "requested that cognition not be assessed," R. 167, and the District "agreed not to test in that area," at that time, R. 1571; *see also* R. 2119. H.W. qualified for "special education supports and services as a

---

[2] At times the Court will use the term "parents" even though some records indicate that the mother may have participated more extensively. Nothing of record indicates that the parents were in any disagreement regarding the educating of their daughter.

student with an Other Health Impairment (Down's Syndrome) and a Speech Impairment." R. 170. The FIE resulted in a May 23, 2017 meeting of an Admission, Review, and Dismissal ("ARD") Committee ("ARDC") to develop an IEP for H.W. for the 2017-18 school year (Kindergarten). *See* R. 185.

Following that ARD meeting, the District listed H.W.'s Kindergarten instructional setting as "mainstream." R. 182, 205. And commencing August 2017, H.W. would receive (1) occupational therapy for thirty minutes, once per week for three weeks in each grading period and (2) speech language therapy for thirty minutes, six times per nine weeks, with all other instruction in the general education setting. R. 183, 203-04. H.W. would receive facilitated math and reading inclusion jointly in general and special education. R. 183, 203. With respect to H.W.'s least restrictive environment ("LRE"), the District noted that her instructional day was "commensurate with that of students without disabilities." R. 200. The committee recommended that H.W. "receive ALL instruction and services in the general education setting with supplementary aids and services." *Id*. The District rejected a full general education setting because H.W.'s speech impairment required a setting "less distracting . . . than the general education classroom." R. 201. The benefits of removing H.W. from general education classroom for speech therapy outweighed any anticipated harmful effects. R. 202. For April and May 2018, her speech language therapy was modified slightly. *See* R. 183-84, 203, 247.

**B. First Grade and Second Grade**

When the ARDC met in April 2018, it altered the IEP to more of a joint general and special education setting for the 2018-19 school year (First Grade). R. 247-48. But the LRE analysis remained essentially unchanged. *See* R. 245. On November 5, 2018, the District amended H.W.'s IEP to provide more inclusion support and some resource instruction for math and reading. *See* R.

300-03. A resource setting is a "special education setting . . . where direct instruction can be provided to the student at a different ability level that the general education grade level." R. 2122.

In January 2019, Anissa Moore, a Behavior Analyst, conducted an Independent Functional Behavior Assessment ("FBA") "to help he ARD committee further identify function(s) of [H.W.'s] maladaptive behaviors." R. 305. Ms. Moore observed H.W. "two separate days across multiple settings (special education class, general education class, library, lunch, restroom, and hallway transitions)." R. 306. On both days, H.W. "demonstrated maladaptive behaviors that interfered with her learning and/or the learning of others." R. 309. She noted that H.W. "received accommodated assignments" and "consistent intermittent verbal praise throughout work activities for on-task behavior." R. 306. She described an environment with close monitoring, one-on-one instruction, and needed prompts and encouragement. *Id.*

Ms. Moore listed four target behaviors of the District's current FBA: (1) physical aggression, defined as hitting or kicking peers or adults and banging head on wall or table; (2) non-compliant behaviors, defined as "saying 'no', 'uh-uh', refusing to comply with teacher directive"; (3) unexpected verbal responses, "defined as yelling, screaming, or loud vocalizations that result in class disruption"; and (4) property destruction, "defined as swiping items off of furniture, pulling things off of shelves or walls, or knocking over equipment." *Id.* District staff indicated that H.W. would engage in moderate physical aggression toward adults on a daily basis, mild physical aggression towards peers on an hourly-to-daily basis, moderate aggression toward environment or property destruction on an hourly-to-daily basis, and moderate elopement (leaving assigned area) daily with an average of leaving classroom once per day and leaving assigned area four times per day). R. 308. The analyst "primarily agree[d]" with the District's targeted behaviors and felt that her "data sources and independent analysis support[ed] their findings." R. 309.

4

The District sought further revisions of the IEP in February and March 2019. *See* R. 315, 329. And at the annual ARDC meeting held on March 25, 2019, for the 2019-20 school year (Second Grade), the District noted that, for reading, speech, and math, the impact of H.W.'s "disability affects her involvement in the general curriculum as it requires specially designed instruction for adjusting the pacing, delivery, and content of instruction." R. 386-89. For the first time, the District recommended that H.W. "receive part or all instruction in a special education setting." *See* R. 419. It rejected the general education classroom setting as LRE on four grounds: (1) such setting "prohibits the student from achieving all goals/objectives" in her IEP, (2) H.W. "requires instruction based on present competencies which are significantly below current grade placement," (3) necessary modifications "cannot be implemented in the general education classroom without eliminating essential components of the general curriculum/activity," and (4) her speech impairment still required a less distracting setting. *Id*. The benefits of removing H.W. from general education classroom for these reasons outweighed any anticipated harmful effects. R. 420. Both the parents and the District recommended extended school year ("ESY") services. R. 421. Several special education components were added for the remainder of the 2019 Spring semester and continued through the 2019-20 school year. *See* R. 421-22.

At that time, the curriculum was modified to add "pre-K to prerequisite skills level," so the curriculum would have to be done at that level. R. 2127. H.W.'s instructional setting was now characterized as "Resource Room/Services less than 21%" rather than mainstream. *See* R. 424. Her final report card for the First Grade reflects that she was "Promoted to Second Grade" even though every academic area received a mark indicating "Below Grade Level and Requires Urgent Intervention." *See* R. 655-57. Her general education teacher for math and science in Second Grade, Kim Prater, R. 2733-35, testified that H.W. "really was not ready for second grade," R. 2764.

On August 22, 2019, the District revised the annual ARD following discussions regarding transportation services and increasing inclusion support. *See* R. 469-70. On November 6, 2019, the District informed H.W.'s mother that additional information suggests that H.W. "is having trouble making academic progress or regressing," and that a cognitive evaluation would be helpful to "provide necessary and important data about [H.W.'s] current levels of intellectual functioning." R. 1571. The District again revised the annual ARD on November 7, 2019, to address proposed changes to H.W.'s goals for social studies, math, writing, and reading; objectives, accommodations, and schedule of services regarding resource for math and reading. R. 486-87, 495. These actions were proposed because H.W. had "not made expected progress towards her goals" and had not "met expected progress in the past 2 grading periods." R. 495. Although the mother had requested more rigorous goals at the prior annual ARD, she did "not want her request to increase rigor in goals to impact how the campus plans for [H.W.] now that she has not made progress in two grading periods." R. 488. The District reviewed and altered goals, added "a visual daily schedule as a new accommodation," increased resource time for math and reading, and altered speech therapy sessions. R. 489, 495. These alterations put the goal levels where the District had originally planned to set them prior to the mother's request for more rigorous goals.

## C. Third Grade IEP

The present dispute began on March 4, 2020, when the ARDC developed H.W.'s IEP for the 2020-21 school year (Third Grade). *See* R. 515. It noted that the next FIE was due April 30, 2020. *Id*. Math and reading assessments showed a decline in percentage correct from Spring of First Grade to the Fall and Winter of Second Grade. R. 528. And for both First and Second Grade, H.W. had a one percentile ranking. *Id*. Ms. Prater, H.W.'s general education science and math teacher, opined that H.W. "was not ready for third grade" because "the content was very

overwhelming . . . even with the modifications and the accommodations . . . and she was not successful in the second grade." R. 2764. According to Ms. Prater, H.W. needed more academic support and her general education math and science instruction was not appropriate for her. *Id.* When asked whether H.W. had made "progress in those areas over the course of the year," she stated that "there were a couple of bright spots . . . where she might get one answer right, but, no, she did not." R. 2764-65. She agreed to the proposed placement because she felt that H.W. "is partly not in her least restrictive environment that would allow her to bloom and learn and grow and excel." R. 2768.

After reviewing H.W.'s competencies and then-present levels of educational performance, the ARDC determined that H.W.'s impairments affect her involvement and progress in the general education curriculum. R. 529. With respect to LRE, the District noted numerous efforts to modify and supplement H.W.'s participation in general education but found them insufficient for H.W. "to make progress towards her goals." R. 550. Although the District found that H.W. would "receive an academic and social benefit from participation in the general education setting," it also found that her presence in such setting also has an adverse impact on the class because "[s]he often makes grunting noises, she will strike at other students, and at times will swipe materials off desks." *Id.* It further found that the benefits of H.W. "spending most of her day in general education class has diminished as the academic, functional, and social gap have increased during her 2nd grade year." R. 550-51. While H.W. continued "to benefit from peer models in the general education class," she progressed more when receiving "instruction in the resource classroom," which "may be attributed to the small group environment and fewer distractions." R. 551.

The ARDC thus again recommended that H.W. "receive part or all instruction in a special education setting." *See id.* It rejected the general education classroom setting as LRE for the same

reasons stated in the prior ARD meeting, except that it no longer found that the general education setting prohibited H.W. "from achieving all goals/objectives" in her IEP and added another reason – H.W.'s "behavior/needs are such that [she] requires a structured/specialized environment for implementation of the IEP and BIP [(Behavior Intervention Plan)] and/or that [she] and/or other students would not benefit satisfactorily from instruction in the general education classroom." *Compare* R. 419 *with* R. 551. As was the case for the prior school year, the benefits of removing H.W. from general education classroom for the stated reasons outweighed any anticipated harmful effects. *See* R. 552.

The District identified seven challenging behaviors: (1) inappropriate physical contact; (2) pulling own pants or underwear down outside restroom; (3) restroom accidents; (4) inappropriate verbal responses such as grunting sounds or continuous groaning sounds; (5) swiping; (6) elope-ment or leaving class or assigned area; and (7) noncompliance such as yelling "No", screaming, crying, sitting on floor, and kicking feet. R. 569. Behavior 1 was consistent but "very unpredicta-ble" and biting seemed to be reduced. R. 2778. Behaviors 2, 3, and 7 were "pretty consistent" and H.W. still had restroom accidents. *Id*. With respect to leaving class, she had improved, and that behavior had lessened. *Id*. One of these seven "behaviors would occur daily." R. 2779.

For the remainder of the 2020 Spring semester, H.W. would receive increased facilitated support by special education staff and increased language and math resource. *Compare* R. 422 *with* R. 553. And for the 2020-21 school year, she would spend 230 minutes per day in special education, plus additional special education time for speech. *See* R. 554. That transition would require enrollment in a different elementary school and her instructional setting would change from a resource-room oriented setting to a self-contained setting. *See* R. 556. The new campus would still provide access to peers and H.W.'s siblings would have the opportunity to attend the

same campus. R. 2085. But other than her siblings, H.W.'s current peers would not be at the new campus. *Id*.

H.W.'s placement would change to an "essential academics classroom." R. 560, 2076. Such a classroom is a full special education setting without any typically developing students receiving their primary instruction in the classroom. R 2076, 2823-24. But the placement in an essential academics setting would still present H.W. with (1) access to appropriate role models and non-disabled peers, (2) opportunity for social interaction, and (3) some access to general education. R. 2161. Such access and opportunities would arise during her time in the general education classroom, at lunch and recess, and during her specials. R. 2161-62. "Essential Academics" is a "life skills program" that is

> very robust, very engaging, has scope and sequence, has high rigor, [and] has high staff-to-student ratio. It is really a place with many flexible options for station teaching, modeling, grouping. It has opportunity for multisensory instruction in a way that we can use movement, music, all kinds of modalities to seal learning. It is also . . . an opportunity to allow less distraction, less opportunity for frustration, different ways to redirect and help children with regulation. It is a place that allows for a different kind of pacing. But it is also an exceptionally positive environment that is very vibrant . . ..

R. 2798 (modifying format). Students may be placed in such a setting due to behavioral difficulties and the format allows the District "to diminish those behaviors significantly so they do not present in the same way that they might in a general ed location." R. 2824.

Such setting would employ an alternative curriculum which would involve repetitive hands-on activities and would not involve modification of the material presented in the general education classroom. R. 2125. More specifically, an alternative curriculum presents "more hands-on activities, more real life examples," and is "repetitive," whereas a "[m]odified curriculum follows more closely to the grade level" but "may be "a couple of grade levels below" and is "still very much a paper-pencil type of tasks or activities." *Id*. H.W.'s current campus lacks specially

trained education personnel to implement the newly proposed IEP. *See* R. 556.

Lisa Humphrey, employed by the District as "an instructional specialist in the elementary campuses," R. 2586, testified that placement in an alternative curriculum was appropriate for H.W. because the District was "already modifying the work that [H.W. was ] doing so far off grade level." R. 2613. She also expressed concerns about H.W. being "taught in isolation" in her current placement where "there is not another student who is receiving instruction on her same level" in either the general education or resource setting. R. 2613-14. She testified that, although the curriculum is modified in general education for H.W., she did not feel that H.W. was "engaging with the class" – "even though she's included in the setting . . . her instruction is still isolated." R. 2614. The isolated instruction has negative effects and H.W. "needs more support than what she's getting." *Id*.

Ms. Humphrey testified that H.W. "needs alternative curriculum . . . she needs to learn in a group setting with students who are learning at her level" and she thought it would help with behavioral issues. *Id*. "[T]here are benefits to a placement that would show those supports." R. 2614-15. There are benefits to being instructed with peers working at the same level in the essential academics setting. R. 2615-16. She agreed that H.W. would also benefit from spending time in the general education setting around non-disabled peers so that she could see them modeling behavior, to obtain some social interaction, and to receive some of that curriculum. R. 2616. And she felt that the proposed IEP provided the least restrictive environment to provide what H.W. needs. *Id*. Having taught Essential Academics for nine years, she adamantly stated that "there's just a lot of functional supports that are built in, things that would help [H.W.] both academically and the functional place." R. 2615. She described H.W.'s educational program in general as "very unique" with various accommodations and modifications. R. 2593-94.

H.W.'s mother disagreed with all proposed goals and services. R. 560-61. She also disagreed with the statement of potential harmful effects from removing H.W. from the LRE, because it did not include the "additional effect of family and peer separation and segregation," which the District noted. R. 560.

On March 16, 2020, the District suspended direct in-person instruction due to Covid-19 concerns. R. 559. Those concerns also caused the District to postpone the April 2020 FIE. R. 607. In addition, the District emailed H.W.'s mother regarding an April 3, 2020 IFP Amendment that would remain in effect until the return of in-person instruction. *See* R. 1717-22 (Ex. R-25). The District reconvened the ARD meeting on May 14, 2020, in a virtual setting to comply with health and safety recommendations. R. 559. But because the committee did not reach a mutual agreement, the ARD meeting was recessed again until later in May 2020. R. 561, 565.

The committee reconvened again on May 28, 2020. R. 563. At that time, the District recommended ESY and, based upon "data collected and reported in the PLAAFP" ("Present Levels of Academic Achievement and Functional Performance") (found at R. 516-28), it recommended "services where specialized individual instruction can be offered to [H.W.]." *Id*. H.W.'s mother "disagreed with present levels and the services that were proposed in previous meeting," and "requested an Independent Educational Evaluation ("IEE") in order to obtain additional data for the ARDC to consider for the development of the IEP." *Id*. The committee accepted new information in an FBA (found at R. 566-84), agreed to changes in the BIP; recommended goals that it found appropriate despite the mother's disagreement, stated its belief "that the recommendations made are appropriate for [H.W.'s] needs and were based on data collected," and accepted the request for an IEE. R. 563-64.

**D. Third Grade and Due Process Challenge**

H.W.'s mother continued to disagree with the recommended placement change and, on August 31, 2020, requested an administrative due-process hearing in accordance with the IDEA. R. 26-27, 2036. Among other things, she challenged the proposed blended placement on the grounds that it was not the least restrictive environment required by the IDEA. *See* R. 29-32.

In September 2020, the District amended H.W.'s IEP to account for a remote learning contingency plan. R. 610. H.W.'s mother agreed to the proposed change and waived the five-school-day waiting period before the implementation of the proposed IEP but limited her agreement to remote learning only. *See* R. 610, 613. The mother specifically stated that she was not in agreement with the suggested PLAAFP and her consent regarding remote learning "has no bearing on any previous disagreements [with] ARDs or due process hearings." R. 613.

On October 22, 2020, a Due Process Hearing Officer, Brenda Rudd, conducted a prehearing conference. *See* R. 2032-40. The relevant time-period to be considered at the hearing went back to August 31, 2019. R. 2036.

On January 3, 2021, Sabina Duhon conducted an Independent Educational Evaluation for Speech and Language. R. 677-704. She recorded mild-to-moderate impairment in attentiveness, moderate-to-severe impairment in receptive language, and severe impairment in both speech and expressive language. R. 697. Her overall impression was that H.W. has a communicative disorder that affects her educational performance resulting in a need for specially designed instruction and/or related services and supports. R. 703. She testified that "the more access that [H.W.] has to her same age and grade level peers for communication the better." R. 2513. She viewed the general education setting as "ideal for [H.W.] because she can learn from [her peers]." *Id.*

H.W.'s parents obtained an IEE on January 6, 2021. *See* R. 707-22. Licensed Psychologist Laura Eskridge, Ph.D. ("Dr. Eskridge") independently evaluated H.W.'s then current behavioral, intellectual, and academic functioning and conducted an FBA. R. 707. She characterized the March 2020 proposed changes as "a significant alteration" to H.W.'s educational placement. *Id*. She noted several caveats regarding her evaluation: (1) "the evaluation was requested and completed during the COVID-19 pandemic, impacting not only [the] educational environment but also testing and data collection"; (2) H.W. "received her education solely in a virtual environment, dissimilar to her placement during the majority of the 2019-2020 school year"; (3) all observations occurred virtually; and (4) testing was not done face-to-face. R. 708. After reviewing H.W.'s progress, Dr. Eskridge noted that H.W. had met or exceeded mastery criteria on ten of twelve IEP goals by October 2020, and the other two goals indicated "great progress" or "excellent growth." R. 709-10.

In conducting her FBA, Dr. Eskridge recorded two behaviors that appear to most frequently impact H.W.'s current functioning in the classroom – inappropriate physical contact and off-task or inattentive behavior. R. 715. She recorded mild, daily-to-weekly inappropriate physical contact and moderate, daily off-task or inattentive behaviors. R. 716. No one observed either elopement or noncompliance during virtual instruction. R. 715. She also viewed swiping as unnecessary for behavioral intervention. R. 716.

Dr. Eskridge limited both her summary and recommendations to available information. *See* R. 718. In her summary, she again noted that the pandemic prevented her from testing H.W. "via standardized, face-to-face assessment"; thus, the "evaluation of [H.W.'s] intellectual abilities as well as her academic and adaptive behavior skills could not be assessed directly." *Id*. She instead focused on parent-and teacher-rated measures and interviews. *Id*. She further noted that the

"teacher-rated measures could not be interpreted with confidence," because they had only inter-acted with H.W. through the virtual learning environment. *Id.*

In her recommendations, Dr. Eskridge stated: H.W.'s "programming, which is a combina-tion of facilitated general education and special education/resource instruction, appears appropri-ate for her needs." *Id.* Although she recommended "some additions/modifications to her current programming," she found that District records indicate that H.W. "has made academic, social, and behavioral progress under her current programming." *Id.* Because H.W. had "demonstrated im-provement on the majority of her IEP goals from May 2019 to October 2020 . . . removal from her home campus and placement in a more restrictive environment appears inappropriate for [H.W.], at this time." *Id.*

The Hearing Officer commenced the due process hearing on January 18, 2021. *See* R. 2041. Sixteen joint exhibits were admitted. R. 2044, 2056. Appellant offered sixteen of her twenty-one listed exhibits without objection and the Hearing Officer admitted each of those. *See* R. 2044-45, 2052. She did not offer three exhibits and withdrew two others. R. 2045, 2051. Similarly, the Hearing Officer admitted nineteen exhibits offered by the District, with one withdrawn and admis-sion of others withheld until they were offered through specific witnesses. *See* R. 2046-47, 2052-55.

Three witnesses (Carolina Ferrell, Shelby Smith, and Brooke Simmons) testified on Janu-ary 19, 2021, and the Hearing Officer admitted eight more exhibits (Exhibits 1, 6, 7, 9, 10, 11, 34, and 35) offered by the District. *See* R. 2063-64. The District employed Ms. Ferrell as a special education coordinator. *See* R. 2073. Ms. Smith worked as H.W.'s special education teacher and case manager from 2018 through 2020. R. 2195-98. Ms. Simmons worked as "the coordinator of psychological services" for the District. R. 2314.

The next day, five witnesses (Georgia Joudah, Ms. Duhon, Dr. Eskridge; Ms. Humphrey; and Gena Bennett) testified, and the Hearing Officer admitted four additional exhibits (Exs. 3 and 5 from Appellant and Exs. 16 and 18 from the District). R. 2399-2400. The District employed Ms. Joudah as a "behavior analyst." R. 2402. Ms. Duhon worked as a private speech pathologist with a master's degree. R. 2488. She testified "as an expert speech pathologist," without objection. R. 2490. Dr. Eskridge testified "as an expert in school psychology," without objection. R. 2529. The District employed Ms. Bennett as a "speech/language pathologist," R. 2637.

Three witnesses (Ms. Prater, Michele Martella, and Ms. Simmons (again)) testified on January 21, 2021. R. 2730. The Hearing Officer admitted five additional exhibits from the District (Exs. 13, 30, 31, 32, and 33). R. 2731. The District employed Ms. Martella as "executive director for special education services." R. 2790.

**E. Decision of Hearing Officer and Appeal**

The Hearing Officer issued her decision on March 19, 2021. *See* R. 1-21. As found by the Hearing Officer, for her first three years of schooling at Comal ISD, H.W. primarily received her educational instruction in a general education setting. R. 2; *accord* R. 2076-77. Nevertheless, as the above recitation of the evidence reflects, while she was primarily in a general education setting, she received gradually increased amounts of inclusion support (special education services provided in the mainstream classroom) and time in a special education setting where students get more focused instruction, i.e., a resource room. *See also* R. 2242-43 (discussing amendment to her 2018 IEP). The Hearing Officer recognized these changes. *See* R. 2-9. H.W. had a modified educational curriculum, which means it was "not at . . . .the student's grade level," R. 553, 2120, which the Hearing Officer also recognized, *see* R. 15. H.W.'s modified curriculum was "[v]ery scaffolded down," like a prerequisite to what was being taught in the regular curriculum. R. 2599. The District

modified her curriculum from a second-grade level to a pre-kindergarten or kindergarten level, depending on the particular skill. R. 2127, 2601. And, while in a general education classroom, a special education staff member was with her at all times. R. 2246-47, 2741. This staff member would work with her on the modified curriculum and would provide attention, prompts, and reinforcers to encourage her to do her tasks. R. 306.

After gradually tinkering with H.W.'s IEP to include more and more special education time, the District proposed a more significant change to a blended placement in March 2020. This placement would include less time in general education setting than previously, and more time in a self-contained special education setting. R. 556. This proposal led to the due process hearing. After taking testimony and evidence, the Hearing Officer determined, among other things, that the District's proposed placement for H.W. was appropriate. *See* R. 1-21. H.W., through her mother, now appeals the special due process hearing.

## II. IDEA

"The Individuals with Disabilities Education Act (IDEA or Act) offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). When a State accepts the offer of funds, it "pledges to comply with a number of statutory conditions," including providing "a free appropriate public education—a FAPE, for short—to all eligible children." *Id.* (citing 20 U.S.C. § 1412(a)(1)). States "covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP." *Id.* at 994 (citing § 1401(9)(D)).

The "centerpiece of the statute's education delivery system for disabled children" is the IEP. *Id.* (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). As a "comprehensive plan prepared by

a child's 'IEP Team' (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures." *Id.* (citing § 1414(d)(1)(B)). Through the IEP, the school district tailors the "special education and related services . . . 'to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). Furthermore, an IEP

> must assure that, to the maximum extent appropriate, States will mainstream disabled children, i.e., that they will educate them with children who are not disabled, and that they will segregate or otherwise remove such children from the regular classroom setting only when the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily.

*Honig*, 484 U.S. at 311 (citation, internal quotation marks, and ellipses omitted); *accord* 20 U.S.C. § 1412(a)(5); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1045 (5th Cir. 1989). When the IDEA speaks in terms of "Educational placement," it means the "educational program—not the particular institution where that program is implemented." *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003).

Although educators and parents "often agree about what a child's IEP should contain," they also disagree at times. *Endrew F.*, 137 S. Ct. at 994.

> When disagreement arises, parents may turn to dispute resolution procedures established by the IDEA. The parties may resolve their differences informally, through a "[p]reliminary meeting," or, somewhat more formally, through mediation. If these measures fail to produce accord, the parties may proceed to what the Act calls a "due process hearing" before a state or local educational agency. And at the conclusion of the administrative process, the losing party may seek redress in state or federal court.

*Id.* (citations omitted).

In an appeal of a special education due process hearing, the IDEA directs that the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). As used in this

provision, "appropriate" means "'appropriate' in light of the purpose of the Act." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).

Under this provision, the Court "is required to accord due weight to the hearing officer's findings, but it must ultimately reach an independent decision based on the preponderance of the evidence." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 966 (5th Cir. 2016) (omitting internal quotation marks, footnote, and citation). In other words, the Court's "review of a hearing officer's decision is virtually de novo." *Id.* (same). Courts review the administrative record and any additional evidence requested to determine whether "there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Id.* (citations omitted). Some courts refer to the applicable standard of review in these cases as "modified de novo." *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 790 (6th Cir. 2018).

That a reviewing court bases "its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206 (addressing predecessor statute to § 1415). Thus, "the statutory authorization to grant 'such relief as the court determines is appropriate' cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress." *Id.* Accordingly, the Court's inquiry is whether (1) the State has complied with the procedural requirements of the IDEA and (2) "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefit." *Id.* at 206-07. Courts cannot require more than compliance with these two requirements. *See id.* at 207.

But *Rowley* "expressly declined 'to establish any one test for determining the adequacy of educational benefits' under the Act." *Endrew F.*, 137 S. Ct. at 998 (quoting *Rowley*, 458 U.S. at

202).

> While *Rowley* declined to articulate an overarching standard to evaluate the ade-
> quacy of the education provided under the Act, the decision and the statutory lan-
> guage point to a general approach: To meet its substantive obligation under the
> IDEA, a school must offer an IEP reasonably calculated to enable a child to make
> progress appropriate in light of the child's circumstances.
>
> The "reasonably calculated" qualification reflects a recognition that crafting an ap-
> propriate program of education requires a prospective judgment by school officials.
> The Act contemplates that this fact-intensive exercise will be informed not only by
> the expertise of school officials, but also by the input of the child's parents or guard-
> ians. Any review of an IEP must appreciate that the question is whether the IEP is
> reasonable, not whether the court regards it as ideal.

*Id.* at 998-99 (citations omitted).

Even though "*Endrew F.* provides more clarity for what constitutes an appropriate IEP,"

its standard does not render inapplicable Fifth Circuit precedent that predated it. *E.R. ex rel. E.R.*

*v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 765 (5th Cir. 2018) (relying on *Cypress-Fair-*

*banks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245 (5th Cir. 1997)). To determine

"whether an IEP is reasonably calculated to provide a meaningful educational benefit under the

IDEA," and thus appropriate, *Michael F.* sets out the following four factors or indicators:

> (1) the program is individualized on the basis of the student's assessment and per-
> formance; (2) the program is administered in the least restrictive environment; (3)
> the services are provided in a coordinated and collaborative manner by the key
> "stakeholders"; and (4) positive academic and non-academic benefits are demon-
> strated.

118 F.3d at 253. These factors were derived from the implementing regulations of the IDEA. *See*

*id.* at 253 n.29. *Endrew F.* did not "render the *Michael F.* factors inapplicable," rather the two

cases "fit together." *E.R.*, 909 F.3d at 765.

Some courts refer to the factors as "the *Michael F.* test," *see*, *e.g.*, *Richardson Indep. Sch.*

*Dist. v. Michael Z*, 580 F.3d 286, 294 (5th Cir. 2009), but courts are not required to consider or

weigh these factors in any particular way, *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 396

(5th Cir. 2012). Because the factors are "intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," the courts do "not legally err by affording more or less weight to particular *Michael F.* factors." *Michael Z*, 580 F.3d at 294. Nevertheless, because "the whole educational experience, and its adaptation to confer 'benefits' on the child, is the ultimate statutory goal," courts should consider the factors "[f]rom this holistic perspective." *Hovem*, 690 F.3d at 397. To determine whether an IEP provides a meaningful "educational benefit," the Court must look beyond mere "weaknesses caused by [the student's] learning disability," it must instead focus on the student's "overall academic record" at the school. *See id.* Stated differently, "overall educational benefit, not solely disability remediation, is IDEA's statutory goal." *Id.* at 398.

Furthermore, "the *Rowley* test does not advance [a court's] inquiry when the question presented is whether the Act's mainstreaming requirement has been met." *Daniel R.R.*, 874 F.2d at 1045. Satisfaction of this requirement is not evaluated "in the abstract"; instead "that laudable policy must be weighed in tandem with the Act's principal goal of ensuring that the public schools provide handicapped children with a free appropriate public education." *Id.* at 1044-45. For such circumstances, which is also referred to as the least-restrictive-environment or LRE, the Fifth Circuit has "stated a flexible, two-part test." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013 (5th Cir. 2010) (relying on *Daniel R.R.*, 874 F.2d at 1048).

> First, [courts] ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends to provide special education or to remove the child from regular education, [courts] ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel R.R.*, 874 F.2d at 1048; *accord R.H.*, 607 F.3d at 1013. Various factors may impact both inquiries and "no single factor is dispositive in all cases." *Daniel R.R.*, 874 F.2d at 1048. Courts instead conduct "an individualized, fact-specific inquiry that requires" careful examination of "the

nature and severity of the child's handicapping condition, his [or her] needs and abilities, and the schools' response to the child's needs." *Id*. Furthermore, LRE "denotes 'not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers to the maximum extent possible." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 n.2 (5th Cir. 1993) (quoting *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 n.23 (5th Cir. 1992)). Importantly, "*Michael F.* and *Daniel R.R.* are not in conflict"; instead, the "analysis of the second *Michael F.* factor . . . is guided by *Daniel R.R.*" *R.H.*, 607 F.3d at 1013.

Additionally, when "assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207. The IDEA left "primary responsibility" for formulating the educational program "and for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Id*. As the Fifth Circuit stated long ago, it is not the role of the courts "to second guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the Act." *White*, 343 F.3d at 377 (citation omitted). And "the IDEA creates a presumption in favor of a school system's educational plan, placing the burden of proof on the party challenging it." *Id*. In the Fifth Circuit, the "party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Michael F.*, 118 F.3d at 252. The challenging party bears that burden at both the administrative and district court levels. *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 n.4 (5th Cir. 2009).

### III. APPELLATE CHALLENGE

Appellant challenges the Hearing Officer's decision to uphold the District's decision to

alter her IEP to remove her from her primarily general education placement to a more blended class environment. She contends that the relevant facts in this case are "practically identical" to facts in a recent Fifth Circuit case which held that the school district was required to continue the student's education in the general education classroom. *ECF No. 14* at 4 (relying on *A.B. ex rel. Jamie B. v. Clear Creek Indep. Sch. Dist.*, 787 F. App'x 217 (5th Cir. 2019) (per curiam)). In addition, she argues that (1) she has mastered or made progress in all IEP goals, (2) the District's position that she should not be in general education unless she can keep up with the other students in her general education class is contrary to law; (3) she receives non-academic benefits in the general education classroom; (4) she does not create any undue burden on her teacher or classroom; (5) a change to a more restrictive placement should not be made absent more information; (6) she does not presently show any need for a more restrictive environment; and (7) the District's blended model does not satisfy the LRE requirement. *Id.* at 5-28.

The Hearing Officer addressed six issues: (1) whether the District's proposed placement in a more restrictive environment was appropriate for the 2020-21 school year; (2) whether the District failed to evaluate H.W. appropriately, particularly whether the most recent FIE is adequate; (3) whether H.W.'s education program is appropriate; (4) whether the District failed to implement direct teaching strategies; (5) whether the District adequately trained staff in differentiated instruction; and (6) whether the District failed to assess H.W. for assistive technology ("AT") needs. R. 1. Clearly, these listed issues do not directly parallel the arguments presented in this appeal. There is no need to address Issues 4 and 5 in this appeal, because Appellant does not challenge them. Further, the Court only addresses Issues 2 and 6 to the extent relevant to this appeal. Appellant undoubtedly challenges the related Issues 1 and 3.

The Court's task is to conduct a de novo review of the evidence while giving due weight

to the Hearing Officer's findings. Based upon such review, the Court disagrees with no material finding of fact or conclusion of law of the Hearing Officer. Appellant places great reliance on the *A.B.* case but the fact-intensive nature of the inquiries before the Court precludes simply following the result of a different case. As recognized by the Supreme Court, educational instruction must be designed to meet the "unique needs" of the student. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999-1000 (2017); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181, 188 (1982). And in *Endrew F.*, the Supreme Court highlighted that an IEP must be reasonably calculated for the student to make progress appropriate in light of that child's circumstances. 137 S. Ct. at 999-1001. The Supreme Court recognizes the importance of considering the unique needs and specific circumstances of the student eligible for special education and related services.

Other reasons also caution against simply following the result in *A.B.* First, *A.B.* differs from this case in an important procedural manner – the hearing officer there agreed that the proposed removal of the student from the general education classroom would violate the IDEA. *See* 787 F. App'x at 220. Thus, any due weight given to the hearing officer's findings would favor the student. Here, giving due weight to the findings of the hearing officer does not favor H.W. except for the AT matter, which is only tangentially related to the issues in this appeal. Moreover, despite H.W.'s contentions to the contrary, the Court finds the facts here differ materially and substantially from the facts in *A.B.* The Court will further address these factual differences later in this Memorandum Opinion and Order.

This case requires the Court to apply the law to the unique facts and circumstances relevant to H.W. From the vantage point of this neutral arbiter, it appears that both sides want to develop an individualized educational program that is in the best interests of the student to the extent

possible. When parents examine "the educational opportunities available" for their disabled child, they "may be expected to focus primarily on [their] own child's best interest." *Daniel R.R.*, 874 F.2d at 1052. Similarly, when state and local school officials are examining the alternatives for educating a handicapped child, the child's needs are a principal concern." *Id*. But, of course,

> other concerns must enter into the school official's calculus. Public education of handicapped children occurs in the public school system, a public institution entrusted with the enormous task of serving a variety of often competing needs. In the eyes of the school official, each need is equally important and each child is equally deserving of his share of the school's limited resources.

*Id*. While the parties strive to provide for H.W.'s best interests, they disagree as to whether the proposed blended program fulfills their desire, and more directly, whether it complies with the dictates of the IDEA.

The Court thus examines the administrative record to determine whether the proposed blended placement was reasonably calculated to provide a meaningful educational benefit, and thus appropriate under the four *Michael F.* factors. Because the mainstreaming factor, requires a more detailed discussion and analysis, the Court first addresses the other three factors.

## A. Individualized IEP

The first factor – individualized IEP based on student's assessment and performance – does not appear much in dispute. The Court has no difficulty in finding that the preponderance of the evidence shows that the IEP was developed for the individualized needs of H.W. The District and a team of professionals evaluated, observed, and assessed H.W.'s individual abilities and needs. H.W.'s parents and teachers provided input. The record is replete with evidence of meetings between interested parties regarding the various IEPs, and the challenged March 2020 program is no exception.

**B. Key Stakeholders**

Similarly, the record shows that the key stakeholders were major participants in a coordinated and collaborative development of the IEP and the services to be provided. As stated above, the District relied on numerous professionals and teachers, in addition to obtaining input from the parents. The record reflects that everyone had H.W.'s well-being as a primary objective, even when there was disagreement between the District and the parents. And the Fifth Circuit has specifically rejected "the assertion that parents are denied input into a decision if their position is not adopted." *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003).

**C. Positive Academic and Non-academic Benefits**

With respect to demonstration of positive academic and non-academic benefits, Appellant stresses that she mastered or made progress in all of her IEP goals prior to the proposed change in March 2020. And at the March 2020 ARD meeting, the District undoubtedly recognized that H.W. had received academic benefits in the general education classroom. *See*, *e.g.*, R. 550, 604, 2079, 2087-89, 2301-04, 2628-29. The District also recognized that she had received non-academic benefits during her placements in general education. *See*, *e.g.*, R. 550, 2081-84, 2616. No one really disputes that H.W. would receive both academic and non-academic benefits from the proposed IEP and the preponderance of the evidence clearly shows that she would receive such benefits from the challenged educational program. Appellant's focus on progress with her prior IEP goals goes to whether the proposed program constitutes the least restrictive environment.

**D. Least Restrictive Environment**

The crux of this appeal lies with the second *Michael F.* factor – whether the March 2020 IEP satisfies the LRE or mainstreaming requirement of the IDEA. Analyzing this issue requires the Court to consider whether the pertinent IEP places H.W. in the least restrictive environment

where she could achieve an appropriate education. And the IDEA merely mandates an IEP reasonably calculated to offer H.W. to make progress appropriate in light of her circumstances. To determine whether the District has complied with the mainstreaming requirement, the Court applies the two-part test enunciated in *Daniel R.R.*

### 1. <u>Can Education in Regular Classroom be Achieved Satisfactorily?</u>

The Court's first inquiry is "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989). This inquiry quickly ends unsatisfactorily to the school district if the district has failed to take steps to accommodate the student in regular education. *See id.* But this case presents no doubt that the District has taken steps to accommodate H.W. in regular education. Indeed, H.W. does not argue that the District failed to take steps to accommodate.

The Court next considers whether the District's accommodation efforts are sufficient. *Id.* "The Act does not permit states to make mere token gestures to accommodate" a disabled student, it instead provides a broad, but not limitless, requirement to modify and supplement the regular or general education setting for the student. *Id.* Efforts to accommodate should be geared toward providing an educational benefit to the student.

> The IDEA does not entitle a disabled child to an IEP that maximizes his potential, but instead only guarantees a "basic floor" of opportunity "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." The educational benefit, however, "cannot be a mere modicum or de minimis; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement."

*R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (quoting *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009)). Progress means more than mere trivial educational advancement, because "the educational benefit that an IEP is designed to achieve must

be 'meaningful.'" *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 248 (5th Cir. 1997). The IEP "must be appropriately ambitious in light of [the student's] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).

In *Daniel R.R.*, the Fifth Circuit found three considerations pertinent to the sufficiency of accommodation efforts: (1) "whether the child will receive an educational benefit from regular education," (2) "the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child," and (3) "what effect the . . . child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving." 874 F.2d at 1048-49. But *Daniel R.R.* also recognized that such factors are not exhaustive, no factor is necessarily dispositive, and the analysis requires an individualized, fact-specific examination of the nature and severity of the student's disabling impairments, the student's needs and abilities, and the school district's response to the student's needs. *Id.* at 1048.

### a. General Considerations

In this case, the student has multiple and severe disabling impairments that affect her abilities in numerous respects. She has a speech impairment that has required a special education component since she began her formal schooling. She has or has had a wide spectrum of behavioral issues that have impacted her ability to maintain focus and attention while also potentially posing significant distractions to others in her class. She needs, and has been provided, one-on-one attention and supervision. Her impairments have required a special education teacher to sit with her in

the regular education class to provide prompts, encouragement, and instruction while also inter-
ceding when behavioral issues manifest themselves. She has severe learning issues and has been
provided a modified curriculum that is at the pre-kindergarten or kindergarten level. The District
has provided an ever-changing individualized educational program to accommodate the student in
the regular classroom while also continually increasing the student's time in the special education
setting.

### b. <u>Educational Benefit</u>

There is no significant dispute that H.W. made progress with her goals in her prior blended
educational program where she was primarily placed in the general education setting with supple-
mental aids and services. Thus, to some extent, she was receiving academic benefit in that setting.
But the more apt inquiry is whether she was making appropriate progress in that setting. *See En-
drew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999-1001 (2017). Her
program placement must place her in the least restrictive environment, but it must also place her
where she can achieve an appropriate education. And to determine whether a student is receiving
a meaningful educational benefit, courts must focus on the overall academic record – they cannot
simply consider progress on goals formulated based on weaknesses resulting from the student's
disability. *See Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 397-98 (5th Cir. 2012).

As the Hearing Officer stated, *Daniel R.R.* requires more consideration than merely pro-
gress on IEP goals. R. 15. Appellant argues that, in making that statement, "the Hearing Officer
appears to have overlooked the fact that the school district itself based its placement on [her] rel-
ative progress." ECF No. 14 at 9 (citing R. 2077). The Hearing Officer, however, specifically noted
that the "District's reason for the change in placement was due to Student's lack of adequate pro-
gress toward her goals in the general education classroom." R. 9, ¶ 44. The Hearing Officer further

noted:

> District's reasons for recommending the Essential Academics placement were that
> [Texas] objectives for Student's assigned grade level exceeded her present levels
> of educational performance, thus Student required instruction based on present
> competencies that were significantly below current grade placement. District be-
> lieved that modifications required for Student to achieve goals and objectives in her
> IEP could not be implemented in the general education classroom without elimi-
> nating essential components of the general curriculum. Further Student's behav-
> ior/needs were such that she required a structured/specialized environment for im-
> plementation of her IEP and BIP. Finally, District determined that Student's Speech
> Therapy goals and objectives required a small group/individual setting in a less
> distracting environment than a general education classroom. . . .

R. 10, ¶ 45. Thus, contrary to Appellant's argument, the Hearing Officer did not overlook the

District's stated reasons for its placement recommendation.

Appellant, moreover, makes too much of the cited testimony. Indeed, primarily, the District

proposed a more blended environment in March 2020 because H.W. "was not making adequate

progress towards her goals in the general education classroom." R. 2077. Similarly, Ms. Ferrell

testified that, although H.W. had made progress with respect to her writing, she had not made

"adequate progress" with respect to writing the letter "H" because this was "a letter that she had

been working on since kindergarten . . . .and she was still not able to that independently." R. 2154-

55. But none of this testimony indicates that the school district made the proposed changes in

March 2020 solely due to progress on IEP goals. Other testimony, furthermore, shows that the

District had a concern that H.W.'s very low "mastery criteria" and her inconsistent progress. R.

2827. Ms. Humphrey shared the concern that H.W.'s performance and progress was inconsistent.

*See* R. 2605, 2611.

Appellant attempts to paint a picture that Ms. Ferrell believed H.W. "was not making ade-

quate progress in the general education classroom because she was not keeping up sufficiently

with her peers in her academic progress." *See ECF No. 14* at 10. But she testified that in her pro-

fessional opinion, the proposed placement change is appropriate for H.W. because the "instruction

in essential academics is more appropriate for her" in that "it would be very individualized to her needs" and "would help her to be able to generalize skills . . . to be able to apply in general ed classrooms." R. 2111. She based that opinion on the changing curriculum with each passing year, a "wider" gap, and "more difficult[y] for [H.W.] to make progress in the general education classroom." R. 2112. Although she agreed that H.W. was making progress toward her goals, she was not making progress "in the general education classroom." *Id*. She later explained that "progress is measured differently" in general education versus the proposed essential academics setting. R. 2184-85. She expressed confusion as to the questioning. R. 2186. She believed H.W. could not learn appropriately in the general education environment because H.W. was unable "to keep pace with the instruction" in that setting; she was unable "to maintain attention and learn the material in the class." R. 2187. And the pace and learning deficiencies were in comparison to "her typically developing peers." *Id*. Considering that comparison and the PLAAFP (found at R. 516), she pointed out the widening gap between what "grade level expectations [are] for second grade students" and what H.W. is able to do. R. 2189. She testified that H.W. was not making sufficient progress as her same-age peers with respect to the regular curriculum and was inconsistently successful on her modified curriculum. R. 2190-91. When the District proposed the Third Grade IEP in March 2020, she did not believe H.W. was able to access the full range of the general education curriculum because H.W. was unable to follow the instruction provided in general education. R. 2162-63.

Viewing the testimony holistically, the Court does not view the above testimony as H.W. not keeping up with her peers so much as factual statements that these are the expectations for second grade and the gap between H.W. and her peers is widening. This is permissible. Whether a student "will receive an educational benefit from regular education," necessarily "will focus on

the student's ability to grasp the essential elements of the regular education curriculum." *Daniel R.R.*, 874 F.2d at 1049. Consequently, school districts "must pay close attention to the nature and severity of the child's handicap as well as to the curriculum and goals of the regular education class." *Id*. A widening gap can indicate that a change is necessary to the student's IEP. Although the Supreme Court declined to "elaborate on what 'appropriate' progress will look like from case to case," *Endrew F.*, 137 S. Ct. at 1001, it still recognized that "the progress contemplated by the IEP must be appropriate in light of the child's circumstances," *id*. at 999. And "for a child fully integrated in the regular classroom, an IEP typically should, as *Rowley* put it, be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id*. (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-04 (1982)). Thus, Supreme Court precedent supports Ms. Ferrell's explanation that progress is measured differently in a general education setting versus a special education setting. Ms. Ferrell's testimony, furthermore, goes beyond predicating access to the general education setting based on H.W.'s inability to perform on par with her nondisabled peers.

This holistic view of Ms. Ferrell's testimony comports with testimony of Ms. Smith, H.W.'s special education teacher and case manager. Ms. Smith testified that, even during general education time, she essentially taught H.W. separately from the teacher. R. 2285-86. She agreed that H.W.'s instruction was "essentially a class of one within a gen ed class." R. 2286. She testified that staff had "to very much coax [H.W.] to get her to do any type of assignment that was presented to her." *Id*. She testified that H.W. "had better engagement" in resource where it was only the two of them in close proximity with "no distractions." R. 2287. The one-on-one with no distractions in the resource room "seemed to benefit [H.W.]." *Id*. These experiences informed her recommendation that H.W. should be placed in the essential academics setting. *Id*. She felt that such setting

would be less distracting and create more engagement than the general education setting. R. 2288. Such setting would present a pace more commensurate with H.W.'s ability to understand the curriculum at her level. *Id*. It would help H.W. develop independence and provide "peers that are very much on her level," from whom she could also gain fulfillment. R. 2289-90. She opined that "receiving instruction in essential academics for part of [the] day would enable [H.W.] to receive more benefit or engage more meaningfully in the general education setting." R. 2289.

Despite the progress on IEP goals and the other non-academic benefits, the District recognized that the general education setting was insufficient for H.W. This recognition was in part due to insufficient academic progress and in part due to H.W.'s exhibited behavioral issues. Appellant overemphasizes and overstates her progress. And a deeper dive into the records show weaknesses in Appellant's position.

For instance, the relevant IEP noted that H.W. "has made progress towards her goals this school year, but would benefit from continuing instruction during the summer." R. 604. The IEP further recognizes that "in the absence of ESY services," H.W. would be "unable to maintain" critical skills due to '[s]evere or substantial regression" and "[p]lacement in a more restrictive instructional arrangement" is warranted based upon goals related to critical skills in social studies, writing, functional, speech, and behavior. *Id*. The IEP also indicates that H.W.'s functional and speech skills exhibit a "[s]ignificant loss of self-sufficiency . . . as evidenced by an increase in the number of direct service staff and/or amount of time required to provide special education or related service. R. 605.

Furthermore, staff also stressed that H.W. received "some" benefit, R. 2304, or made "some progress" on her goals and mastered some goals, R. 2629. H.W.'s special education teacher testified that H.W. derived no academic benefit from the instruction provided by the general

education teacher. *See* R. 2302-04. The District's "instructional specialist" testified that her "primary reason for agreeing that [H.W.] should have a change in placement," was that H.W. could make more progress academically in the new setting. R. 2629. She was also concerned that H.W. "required a certain level of prompting to achieve certain tasks." *Id*. Further, although the District anticipated "some harmful effects" from changing H.W.'s placement, it believed a change was "what she needs at this time," based on the information it had. R. 2087.

The record clearly reflects that H.W. has struggled academically. Of course, the courts "cannot predicate access to regular education on a child's ability to perform on par with nonhandicapped children." *Daniel R.R.*, 874 F.2d at 1047. The issue is whether "the child's individual needs make mainstreaming appropriate," and when they do, the child cannot be denied "access to regular education simply because [her] educational achievement lags behind that of [her] classmates." *Id*. Thus, although "the decision whether to mainstream a child must include an inquiry into whether the student will gain any educational benefit from regular education," the analysis does not stop there. *Id*. The Hearing Officer appropriately recognized that her analysis did not start and stop with H.W. mastering some IEP goals and making some progress on others.

And, while Appellant argues that the Hearing Officer and District erred in requiring H.W. to keep up with her peers to avoid placement in the special education setting, *see ECF No. 14* at 11, neither the District nor the Hearing Officer imposed any such requirement. Instead, consistent with *Daniel R.R.*, they instead focused on H.W.'s individual needs and abilities while recognizing that whether H.W. would receive an educational benefit from the regular education setting requires an understanding of her ability to grasp the essential elements of that curriculum. Further, to the extent Appellant suggests that either the Hearing Officer or the District required H.W. to master the general education curriculum to maintain mainstreaming as a viable option, the Court similarly

33

finds no merit to the suggestion.

### c. Overall Educational Experience

The IEP goals are simply one aspect of H.W.'s "overall educational experience in the main-streamed environment," which requires "balancing the benefits of regular and special education for each individual child." *Daniel R.R.*, 874 F.2d at 1049. The Hearing Officer considered H.W.'s modified curriculum; her one-on-one work with "a special education teacher or paraprofessional" while in the general education setting; her "required attention, prompts, and reinforcers as encouragement to do her tasks"; testimony that the special education taught her "separately from what the general education teacher was teaching"; testimony that the general education setting was essentially teaching her in isolation"; her disruptive behaviors; and her need for attention. *See* R. 15. The Hearing Officer found that H.W.'s overall "benefit from the regular classroom setting was minimal at best." *Id*. She further found that H.W. was less aggressive and exhibited her disruptive behaviors less in the special education setting. *Id*. She also found that H.W.'s "abilities, along with her needs for attention, consistent prompts, redirection, and reinforcement, and her limited engagement with her peers in the regular classroom activities emphasize her need for specialized instruction." R. 15-16.

The Court finds that the preponderance of the evidence supports these findings. Thus, the Court does not find that, under H.W.'s specific circumstances, this is a case where "the benefit that the child receives from mainstreaming may tip the balance in favor of mainstreaming, even if the child cannot flourish academically." *Daniel R.R.*, 874 F.2d at 1049. Not only is H.W. unable to flourish academically in the general education setting, but she obtains minimal academic benefit from the general education setting. Notably, issued guidance from the Office of Education Programs states that "[t]here is no requirement that a student fail in a less restrictive environment

before moving to a more restrictive environment." *See ECF No. 16-1* (Office of Special Ed. Prog., Letter to Richards, 211 IDELR 433 (1987)). Here, H.W. was failing to achieve passing marks while also not mastering some IEP goals.

The District contends that H.W. does not derive much benefit from interacting with her general-education peers because she does not often interact with them. *See* ECF No. 16 at 14. And there is testimony to that effect. *See* R. 2748-49. But what the testimony does not address is the benefit she receives from merely observing the speech and other modeling behavior of her peers. The District downplays the perceived lack of interaction too much. Nevertheless, while H.W. no doubt may benefit from the language models of her peers in the regular education setting or in other ways, the preponderance of the evidence does not show that such benefits tip the balance in favor of mainstreaming more than set out in the challenged IEP. And H.W., furthermore, will still have some access to such models even in the challenged educational program.

The District accurately portrays Appellant's "picture of a student making fine academic progress in a general-education setting" as being based on a "skewed perspective" that distorts the facts. *See id.* at 14-15. As the District describes it, "[t]he story of H.W.'s education so far is one of a student continually struggling to make adequate progress and a district continually responding by increasing her special education supports and lowering her goals." *Id.* at 15. Such description is supported by the record. *See*, *e.g.*, R. 634-54 (Ex. J-14, Reports of Student's Progress between May 2019, and May 2020); R. 1639; 2144-45; 2157, 2191. Furthermore, Ms. Smith testified that H.W. would make more progress in the special education setting. R. 2157, 2286-87. And the challenged IEP would retain a significant opportunity for H.W. to interact with nondisabled peers in a general education setting while also increasing the non-academic benefit from peer interactions with similar-ability peers in the special education setting. R. 2158-62, 2288-89, 2473-74.

Appellant does attempt to rely on the IEE of Dr. Eskridge. But, as the Hearing Officer noted, that assessment is based on faulty and incomplete data. R. 14. That IEE is of limited usefulness for determining the appropriateness of the challenged IEP for H.W.

### d. Effect on Classroom

The Court further finds that the preponderance of the evidence shows that H.W.'s disruptive behavior has a negative, detrimental effect on the education of the other students. Regular placement is not appropriate when a "child is so disruptive in a regular classroom that the education of other students is significantly impaired." *Daniel R.R.*, 874 F.2d at 1049. Further, when "the record is clear" that a general education placement "could potentially cause a disruption or even harm to others," the preponderance of the evidence may support placing the student in a more restricted environment. *C.G. v. Waller Indep. Sch. Dist.*, No. 4:15-CV-00123, 2016 WL 3144161, at *8 (S.D. Tex. June 6, 2016), *aff'd sub nom. C.G. ex rel. Keith G. v. Waller Indep. Sch. Dist.*, 697 F. App'x 816 (5th Cir. 2017), as revised (June 29, 2017). Even without evidence of disruption, the absence of a meaningful educational benefit may justify a change in placement. *See J.H. ex rel. A.H. v. Fort Bend Indep. Sch. Dist.*, 482 F. App'x 915, 919 (5th Cir. 2012) (per curiam).

In this case, the nature, extent, and frequency of H.W.'s various disruptive behaviors are sufficient to significantly impair the education of other students. And while there may be no direct evidence of a significant detrimental effect, Appellant clearly understates the behavioral issues. H.W. would engage in disruptive behaviors daily. R. 2779. Nurse notes show five instances where H.W. bit or kicked a staff member or a fellow student in October and November 2019. *See* R. 1309-11. Ms. Bennett was bitten on both hands by H.W. while in the classroom, R. 1310. She testified that H.W. had exhibited such behavior "before but not often." R. 2651. She further testified that, other than this incident, she only recalled H.W. biting her one other time in the two years

that she worked with H.W. R. 2662.

With respect to the general education classroom, Ms. Bennett testified generally that she observed H.W. "becoming distracted when the students had other things going on in the class-room," and H.W. "also exhibited some aggressive behaviors towards [Ms. Bennett] and other students as well as some swiping behaviors and some vocalizations as well." R. 2649-50. While H.W. still experienced similar behaviors in the speech therapy room, she was not as aggressive. R. 2650. She described the aggressive behaviors as hitting and kicking in addition to biting. R. 2651. When asked about the frequency of such behavior, she testified: "From what I can recall, it may not have been the physical behavior every session but almost every session there was a behavior of some sort that would disrupt the session." *Id*. The frequency of H.W.'s behavior "was lower" when working with her one-on-one in the speech room. R. 2651-52. In addition, H.W. was not physically aggressive in the speech therapy room. R. 2652.

Furthermore, H.W. had a heavier desk than normal to combat her "behavior of tipping the desk over." R. 2741. In the general education classroom, H.W. "would knock things down," also referred to as swiping, "take things from other kids," "put things in her mouth," and hit and kick other students. R. 2742. Some type of these sorts of behaviors occurred "nearly daily." *Id*. Hitting and kicking other students "was pretty often . . . definitely weekly." *Id*.

There was one small group setting where H.W. would misbehave by "hitting the student next to her or swiping everything off," and the teacher felt like no one was really "learning at that time." R. 2750. Appellant tries to paint this as a one-time incident with insufficient information to place much emphasis on it. But it is her burden to show why the IEP and resulting placement were inappropriate under the IDEA. She has not overcome the presumption in favor of the District's educational program.

37

The Court also recognizes that some of the disruptive behavior is dated. But due to Covid-19, the District did not engage in in-person classes the latter part of H.W.'s Second Grade or any of her Third Grade. Moreover, the behavior was not as dated when the District formulated the challenged IEP in March 2020. The Court finds no reason to discount the disruptive behavior due to the contention that it is dated.

### e. Other Considerations

While "first consideration" is to "be given to placement in a regular classroom with any necessary supplemental aides and services to make that placement successful," once "the determination is made that the student with a disability cannot succeed in regular education, then regular education would not constitute the LRE for that student." *See ECF No. 16-2* (Office of Special Ed. Prog., Letter to Cohen, 25 IDELR 516 (1996)). When

> it is determined that a student with disabilities cannot be educated satisfactorily in regular education even with supplementary aids and services, then the student's placement team must select the option on the 'continuum' of alternative placements which best meets the student's needs. The alternative placement chosen must maximize opportunities for the student to interact with nondisabled peers to the extent appropriate.

*See ECF No. 16-3* (Office of Special Ed. Prog., Mem. 95-9, 21 IDELR 1152 (1994)).

In reply, Appellant argues that the District's characterization of her progress as de minimis is nonsensical and if the District designed goals such that mastery of them allowed only de minimis progress, then it never provided a FAPE at all. *See ECF No. 18* at 5 n.2. This argument ignores important context. First, a developed IEP is appropriate when it is reasonably calculated to enable the student to make progress appropriate in light of the child's circumstances. That appropriate IEPs must be reasonably calculated does not mean that the student will make the expected progress. Prospective expectations are not always met. While reviewing an IEP in hindsight, the IEP may appear inappropriate. But that does not mean that the same IEP was inappropriate when

proposed and implemented. The prospective nature of IEPs require review based on the circum-stances present when proposed.

Furthermore, the evidence shows that H.W. did not master all goals. It is entirely possible that the unmastered goals weigh more heavily in the decision to change placements. Additionally, H.W. did not master some goals until October 2020, seven months after the challenged IEP was developed and proposed. Mastery at that point is not irrelevant, but it does cut against Appellant's attacks on the District's March 2020 proposed IEP.

### f. Summary

Considering all of the above-discussed factors holistically the Court finds the preponder-ance of the evidence supports finding that H.W.'s education cannot be achieved satisfactorily in the regular classroom. This finding is consistent with Fifth Circuit precedent that a school district satisfies the first step of *Daniel R.R.* "by considering whether [the student's] IEP could be satis-factorily implemented in a regular classroom." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1014 (5th Cir. 2010). Ample evidence shows that the District considered whether it could imple-ment H.W.'s IEP in a regular classroom and concluded that it could not. Even if the Court chose to accord less weight to H.W.'s disruptive effect on the general education classroom due to some uncertainties as to the extent of such effect, it finds that the other factors provide more than enough reason to find that H.W.'s education cannot be achieved satisfactorily in the regular classroom.

### 2. Has Student Been Mainstreamed to Maximum Extent Appropriate?

Such finding leads to the next inquiry, and the heart of this appeal, whether the District has mainstreamed H.W. "to the maximum extent appropriate." *See Daniel R.R.*, 874 F.2d at 1050. The IDEA does "not contemplate an all-or-nothing educational system in which [disabled] children attend either regular or special education." *See id.* (addressing predecessor to IDEA). Here, H.W.

has been primarily educated in the regular education setting but has had a somewhat blended educational environment since First Grade. But even her earlier, unchallenged placements progressively placed her more and more into a special education setting. The preponderance of the evidence shows that her currently challenged placement is another step in finding the best fit for H.W. Although it is a significant placement change, the preponderance of the evidence shows that it satisfies the LRE requirement of the IDEA. Appellant has not carried her burden to show otherwise.

The fact that H.W. received positive academic and non-academic benefits in one year does not automatically translate to continuing the same mix of regular and special education components the next year. "The appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops." *Id.* at 1050. The hope would be that as a student develops and progresses the more the child can be integrated into the general education setting. But when a student is regressing or not developing or progressing, a more restrictive environment may be needed. School districts have an IDEA obligation to provide "the maximum appropriate exposure" to nondisabled students and peers. *Id.*

**E. Need for More Information**

Appellant argues that the District should not have changed her to a more restrictive environment without obtaining information from various sources it had deemed required. *See ECF No. 14* at 23-27. She recognizes that the Hearing Officer agreed that the District had failed to provide necessary assistive technology evaluation but contends that the Hearing Officer erred in not reaching the derivative conclusion that the District should not have proposed removal from the general education setting prior to obtaining information from such an evaluation. *Id.* at 26. Further, while she recognizes that her parents did not consent to cognitive testing, she argues that the District had

avenues at its disposal that it chose not to utilize. *Id*. at 26-27.

To the extent Appellant challenged the sufficiency of her initial FIE, the Hearing Officer found such challenge untimely as not being brought within one year as required by 19 Tex. Admin. Code § 89.1151(c). R. 16. To the extent Appellant challenges this finding, the Court finds no error.

Further, when considering the appropriateness of the challenged education program, the Hearing Officer (1) applied *Daniel R.R.* and *Michael F.* while recognizing the more recent *Endrew F.*; (2) further recognized that the appropriateness of the IEP depends on compliance with procedural and substantive components and that parental consent was not given for certain aspects needed to evaluate H.W.; and (3) found that the District complied with procedural requirements when developing H.W.'s IEP and that "the 2020-2021 IEP is appropriate and reasonably calculated to produce progress rather than regression or trivial educational advancement." R. 16-18. The preponderance of the evidence supports these findings of the Hearing Officer.

Although the Hearing Officer found compliance with the IDEA's procedural requirements when the District developed the IEP, she also found a procedural error after the District obtained parental consent for an AT evaluation in March 2020. R. 18-20. When considering whether the District failed to assess H.W. for AT needs, the Hearing Officer recognized the duty to assess the student in various areas, that the District faltered in that duty, and thus committed a procedural violation of the IDEA once it had obtained parental consent. R. 18-19. Nevertheless, the Hearing Officer also found that the procedural violation did not impede the child's right to a free appropriate public education and caused no deprivation of educational benefits. R. 20. Although the Hearing Officer did not expressly find that the violation did not significantly impede the parents' opportunity to participate, such finding is inherent in the decision. In fact, part of the procedural error occurred because the District had deferred to the parents' selection of an independent AT

41

evaluator. *See* R. 19. The preponderance of the evidence supports these findings.

The IDEA sets out numerous requirements for evaluation procedures. *See* 20 U.S.C. §
1414(b) and (c). And one such requirement is that school districts "ensure that . . . the child is
assessed in all areas of suspected disability." *Id*. § 1414(b)(3)(B). But school districts must obtain
informed  parental consent for initial assessments and any reevaluations. *Id*. § 1414(a)(1)(D) and
(c)(3); *accord* 34 C.F.R. § 300.300(a)(1)(iii) and (c)(1)(ii). Absent such consent, a district "may,
but is not required to, pursue" any initial evaluation or reevaluation by using "the consent override
procedures" set out in paragraph (a)(3). 34 C.F.R. § 300.300(a)(1)(iii) and (c)(1)(ii). Given the
discretionary nature of using the override procedures, the Court finds no error in not using them
when the preponderance of the evidence supports the Hearing Officer's decision to find, in accord-
ance with 20 U.S.C. § 1415(f)(3)(E)(ii), that the student received a FAPE despite the procedural
violation.

**F. COVID-19 Issues**

Appellant further argues that, not only did she not require a more restrictive environment
when the District proposed the challenged IEP in March 2020, but she does not require it now after
engaging in a virtual educational environment since March 2020. *See ECF No. 14* at 27-28. Until
the new school year commenced a few days ago, the in person educational environment was una-
vailable to H.W. and other students.

The pandemic has no doubt affected the learning environment not only for H.W. but for all
students within the Comal ISD. While there is no good time for a pandemic to emerge, the timing
for H.W. was particularly unfortunate given the March 2020 proposal to change her educational
program in a manner objected to by her parents. The pandemic affected the IEE provided by Dr.
Eskridge and limited its usefulness. It resulted in a virtual learning environment that had never

been used before. It has limited the information available to the District and H.W.'s parents. It has limited the ability to see what, if any progress, H.W. might have made since the challenged proposal. But it provides no basis to find error in the decision of the Hearing Officer.

Although Appellant argues that "[i]t would be inappropriate to permit placement in a more restrictive environment without further data, even if it had been appropriate to make such a placement determination in the first place, which it was not," *ECF No. 14* at 28, she provides no basis or authority for the Court to make that finding. The Court's inquiry is limited to two things – compliance with the procedural requirements of the IDEA and whether the District developed an IEP reasonably calculated to enable H.W. to receive educational benefit. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982). Further, both this Court and the Hearing Officer applied the established legal principles set out in *Daniel R.R.* This Court has reviewed the findings of the Hearing Officer, conducted a modified de novo review of the issues, and found no reason to reverse any portion of the Hearing Officer's decision. That Covid-19 forced H.W. into an entirely new educational environment provides no reason to overturn the decision of the Hearing Officer or to make any finding contrary to the findings stated therein. Regardless of the Covid-19 ramifications, the preponderance of the evidence supports those findings and supports the decision of this Court.

**G. Reliance on *A.B.***

As the Court briefly discussed earlier, Appellant relies on *A.B. ex rel. Jamie B. v. Clear Creek Indep. Sch. Dist.*, 787 F. App'x 217 (5th Cir. 2019) (per curiam)) as dictating an outcome in this case. And in her reply brief, she urges the Court to whether she is more like A.B. or the student at issue in *Brillon v. Klein Independent School District*, 100 F. App'x 309 (5th Cir. 2004). *See ECF No. 18* at 4.

The Court will not reiterate its earlier brief pronouncements on this matter. Suffice to say that it found *A.B.* procedurally and factually distinct from the facts here. Because Appellant so forcefully argues that *A.B.* should control the outcome of this case, the Court further explains the factual differences.

First, A.B.'s educational programs resulted in much more progress by the student and trended toward more time in general education until the District attempted to move him back to a more special-education-oriented program in the Third Grade. *See* 787 F. App'x at 219. In a more special-education environment in the First Grade, A.B. "progressed academically and linguistically, and his behavioral problems abated." *Id*. The student's success in that program resulted in a promotion to a more general-education-oriented program in the Second Grade, which "was also a success," as shown by the student's continued "academic and behavioral progress." *Id*. H.W. has not exhibited the same success and her educational programs have trended toward more and more special education components.

Second. the District Court in *A.B.* found that the student "'exhibited the most progress' and 'received positive, nontrivial, academic and nonacademic benefits' in the general-education classroom." *Id*. at 222. In this case, the preponderance of the evidence shows that H.W. does much better and exhibits the most progress in the special education setting. Although the general education classroom under the prior IEP provided H.W. some positive academic and nonacademic benefits, and she made some progress on some IEP goals while mastering others, the preponderance of the evidence shows that her overall academic record does not exhibit a meaningful educational benefit. That *A.B.* uses the term "nontrivial" does not change the requirement that the benefit be meaningful and appropriate.

In addition, *A.B.* found that the student was "no longer disruptive in a disciplinary sense."

787 F. App'x at 222. Again, that fact finding differentiates the case from this one. Similarly, the District Court in *A.B.* "found both that A.B.'s academic progress was 'markedly improved in a general educational setting' and that A.B.'s behavior and social skills had similarly improved due to A.B.'s ability to model the conduct of his general-education classmates." 787 F. App'x at 223. Neither of those facts are present in this case. And, in *A.B.*, there was evidence that the student would "likely. . . regress" if moved back to the more restrictive environment. *Id*. This case includes no such evidence. Unlike A.B., H.W. began her elementary path in the least restrictive environment and has progressively been shifted more and more to a more restrictive environment.

H.W. is more like the student in *Brillon* because she is not making academic progress in the general education setting and the preponderance of the evidence shows she clearly performs better in the special education setting. *See* 100 F. App'x at 314. The Court has fully considered the decision of the hearing officer at issue in *A.B,* as provided by Appellant. *See ECF No. 14-1*. Following the result of the per curiam circuit opinion in *A.B.* is neither warranted nor advised on the facts of this case. Although the comparison here has been between *Brillon* and *A.B.*, *Daniel R.R.* is the binding Fifth Circuit authority that ultimately controls in this case. The Court has applied the legal principles of *Daniel R.R.* to reach its conclusions in this case.

**H. Summary and Appropriate Relief**

Based on the preponderance of the evidence, the Court has made an independent decision while according due weight to the findings of the Hearing Officer. Under that review, it finds that the District complied with the procedural and substantive requirements of the IDEA with the exception of the procedural error related to the AT evaluation. Appellant has not overcome the presumption in favor of the District's educational plan. She has not carried her burden to show why the challenged IEP and her resulting placement under that program were inappropriate under the

IDEA.

Having considered relevant factors holistically, the Court finds that the preponderance of the evidence shows that educating H.W. in regular classes cannot be achieved satisfactorily and the Comal ISD has tailored H.W.'s special education and services to her unique needs. Of course, in reviewing the prospective judgment by the school district the Court appreciates that the inquiry is whether the Court finds the IEP reasonable, not whether it regards it as ideal. The preponderance of the evidence shows that the challenged individualized education program is reasonably calculated to enable H.W. to receive a meaningful and appropriate educational benefit, to make progress appropriate in light of her circumstances, and to mainstream her to the maximum extent possible.

With those findings on the preponderance of the evidence, the Court must next determine what relief is appropriate. *See* 20 U.S.C. § 1415(i)(2)(C). Appellant asks the Court to reverse the determination of the Hearing Officer and require the District to educate her in the general education classroom. *See ECF No. 14* at 29. Based on the preponderance of the evidence, such relief is clearly not appropriate.

Conversely, the District asks the Court to grant its motion for summary judgment on the administrative record, order that Appellant take nothing, and enter any other relief to which the District is entitled. *See ECF No. 16* at 22. Of course, the Court has already denied the motion for summary judgment, stated its intent to consider the filing as an appellate brief, and indicated that it would apply the well-established procedure for reviewing the administrative record required by the IDEA. *See ECF No. 17* at 3-4. Thus, the District's prayer for relief is not very helpful.

Based on the preponderance of the evidence, the Court finds it is appropriate to affirm the findings and determination of the Hearing Officer. Such affirmance is appropriate in light of the purposes of the IDEA, which is principally to ensure that public schools provide eligible students

with a free appropriate public education. And within that principal purpose lies the entirety of the educational experience and its adaptation to confer benefits on the child.

Although the Court has affirmed the findings and determination of the Hearing Officer, it recognizes that much has changed in the intervening eighteen months since March 2020. Nothing prohibits the parties from obtaining additional information relative to the placement decision. Indeed, the Hearing Officer already ordered an AT evaluation. Based on that evaluation or other information, the parties might decide to meet and confer in an effort to reach a mutual agreement regarding H.W.'s placement. But absent a mutual agreement between the parties, the March 2020 IEP controls until updated through the normal ARDC process or otherwise ordered by a court of competent jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, the Court affirms the Decision of the Hearing Officer. By separate document, the Court will enter judgment affirming that decision.

**IT is so ORDERED.**

**SIGNED this 31st day of August 2021.**

**JASON PULLIAM
UNITED STATES DISTRICT JUDGE**